PARISE, APPELLANT, *v.* OTIS ELEVATOR CO., APPELLEE.[*]

(No. 3713—Decided November 12, 1954.)

*Mr. P. Richard Schumann* and *Mr. Warren E. Grant,* for appellant.

*Messrs. Arter, Hadden, Wykoff & Van Duzer* and *Messrs. Wilson & Wyatt,* for appellee.

PHILLIPS, J. In the course of his employment with the Isaly Dairy Company in Youngstown, plaintiff, a minor aged 14 years, had used an automatic safety controlled self-operated elevator many times in the discharge of his duties; was acquainted with its operation; knew that the door thereof would not open until it was even with the basement, first, second or

---

[*]Motion to certify the record overruled, March 16, 1955.

third floors of the building it served; and would not move from any floor when the door thereof was open, unless tampered with, or manually controlled from the penthouse.

On August 31, 1944, plaintiff unloaded cans of milk from the elevator, wheeled them on a "dolly cart" to a cooler a short distance from the elevator shaft, unloaded the cart and left it about four or five feet from the elevator door, returned to the elevator, looked through the window in the door, saw the elevator at the floor level, reached down and raised the elevator door and gate, turned and went to his "dolly cart," and, walking backward, pulled it toward the door. As he reached the elevator door, which was open, the elevator was not there, the reason for which was not proved, and plaintiff fell 17 feet into the elevator shaft and was injured.

In plaintiff's action in the Court of Common Pleas to recover damages from defendant for alleged negligence in failing to properly inspect and maintain the elevator, in accordance with a contract with the Isaly Dairy Company to perform such service, a jury returned a verdict for the plaintiff for $20,000. The trial judge sustained defendant's motion for a new trial, in the event of a final reversal of the judgment entered for defendant, which motion was filed on the grounds of "passion and prejudice" and that the verdict was not sustained by sufficient evidence; entered judgment for defendant notwithstanding the verdict of the jury returned for plaintiff; and denied plaintiff's "application for amplification and clarification of the judgment of the Court" of Common Pleas.

The cause comes to this court on plaintiff's appeal on questions of law from the judgment of the trial court rendering judgment for defendant notwithstanding the verdict of the jury.

The evidence discloses that, in accordance with the provisions of the inspection, repair and maintenance contract existing between defendant and the Isaly Dairy Company, defendant maintained and serviced the elevator, including the safety devices (so far as allowed by the Isaly Dairy Company); and that defendant inspected the 100 parts of the elevator three times each month, each inspection consuming approximately an hour to an hour and a quarter, which as far as the evidence dis-

closes was adequate and in keeping with approved engineering practice.

An inspection made shortly after plaintiff was injured revealed that the locking bar and the latch on the inner lock were operating in such a manner as to permit the opening of the elevator door when the elevator was not at a floor level, and "by going down and rocking it I [Ralph Britton, Isaly plant engineer] could come up through, but if it was solid against the latch, I couldn't pull it up."

The contract of inspection executed by defendant and the Isaly Dairy Company provided:

"It is mutually understood that we are not required to make renewals or repairs necessitated by reason of negligence or misuse of the machinery, apparatus or car, or rendered necessary due to any other cause beyond our control. We shall not be required to make any safety tests; nor to install new attachments on the elevator as recommended or directed by insurance companies, or government, state, municipal or other authorities."

Plaintiff's witness, Walter Paulo, general manager of the Isaly Dairy Company, testified:

"Q. Do you have a maintenance department or any other department in the Isaly Dairy Company that works on the elevators, Mr. Paulo? A. In emergency they might, because sometimes they are very minor and it is easier to fix it than it would be to tell him.

"* * *

"Q. Now, this damage, you say some damage is done to the elevator, is that correct, Mr. Paulo, by the dollies—is that the correct term—by the boys, the way they would handle it with the door? A. It is subject to considerable abuse because it is a 24-hour operation, and sometimes they run a heavy truck up against the doors and can bend them or throw them off the track or actually break the slats. It is possible to damage them, and they do get damaged."

Witness Meunier, defendant's former local manager, testified:

"Q. Your contract specifically excludes any damage done by impact, doesn't it? A. That's right.

"* * *

"Q. During the period of this contract, Plaintiff's exhibit 1, 1942 through 1947, the Isaly plant engineer and his men right under him in his own department there, all Isaly employees, they made various repairs out there themselves, didn't they? A. Oh, they made a lot of repairs.

"* * *

"Q. Would they make various repairs to the interlocks? A. Yes, they would.

"* * *

"Q. Mr. Meunier, during the period, '42 through '47, did the Isaly engineers themselves make their own repairs to the interlocks on the hoistway? A. They made their repairs, and they also put in fuses, and they would call us when they would blow two or three fuses and we would have to go out.

"Q. My question was: Did the Isaly plant engineers during the period, '42 to '47, make their own repairs from time to time to the interlocks on the hoistway gates? A. Yes, they have. I know they have because we used to furnish them with parts, and we would furnish them certain materials.

"Q. That would be true of the hoistway gates on the loading platform level? A. That's right.

"* * *

"Q. Would they say to you ever, 'No, we won't fix it'? A. Yes, he would say to me, 'I will take care of it myself. I have got the parts here for it.' "

The Isaly Dairy Company's chief engineer at the time plaintiff was injured testified:

"Q. And they would wait until a certain portion of the descending car matched that line and then let go of the button; is that right? A. That's right.

"Q. What sort of repairs did you and the men under you that worked for Isaly's make to this elevator * * *? A. Minor repairs such as cables on the gates. If a cable would break on the gate, we would have those there.

"* * *

"A. We made minor repairs. Cables on the gates was mostly our repair work, and, of course, we had extra locks and parts in case they were needed. But anything that amounted to anything serious, why, I called Otis Elevator and they serviced it.

"* * *

"Q. What sort of treatment did these hoistway gates get in the use that the Isaly employees made of the elevator with the hand trucks, and so forth? A. Well, I had to service them. They get some pretty rough usage.

"* * *

"Q. Did you or any of your men ever make any adjustments to the locking bars from time to time? A. Yes, we have."

Isaly employee Snyder testified:

"Q. Did you ever know of that elevator to leave the floor when the door was open? A. The only way it would leave the floor that I know of is if they would hold the switch in and leave the doors up and press the button, and then it would.

"Q. Did you ever have the experience of doing that? A. Yes, we have done it, loading and unloading."

There is other evidence that the elevator door and gate could not be opened except by the safety-controlled designed means, unless it was forced. Also, there is evidence that Isaly employees tampered with the elevator's safety devices; that minor employees of the Isaly Dairy Company at times forced the interlock on the safety doors by rocking the hoistway gates, and thereby, for the sport of it, imprisoning fellow employees in the elevator between floors, holding them there awhile and then releasing them; and that Isaly employees tampered with the automatic electrical safety devices with which the elevator was equipped to enable them to more easily perform their duties as Isaly employees.

As the result of a careful reading of the voluminous 524-page bill of exceptions submitted to us and an equally careful consideration of the entire record, we conclude that, even if plaintiff is free from negligence contributing to his injuries, defendant can not be held liable for plaintiff's injuries unless,

as plaintiff urges, the doctrine of *res ipsa loquitur* operates against defendant, which question we proceed to determine now.

The doctrine of *res ipsa loquitur* does not apply in this case for the reason that the evidence discloses clearly that defendant did not have "exclusive possession, control and management of the instrumentality [elevator] at the time it caused the injury," and had never had such exclusive possession, control and management of the elevator after its installation. See *Koktavy* v. *United Fireworks Mfg. Co., Inc.,* 160 Ohio St., 461, 117 N. E. (2d), 16; *Krupar* v. *Procter & Gamble Co.,* 160 Ohio St., 489, 117 N. E. (2d), 7, and cases cited therein.

Since we conclude that the doctrine of *res ipsa loquitur* is not applicable in this case, it is necessary for plaintiff to "show the existence of a duty on the part of the one sued not to subject the former to the injury complained of, a failure to observe such duty, and an injury resulting proximately therefrom." See paragraph one of the syllabus in *Thrash, a Minor,* v. *U-Drive-It Co.,* 158 Ohio St., 465, 110 N. E. (2d), 419.

There is evidence that "three-eighths to a half inch play" was necessary to the proper operation of the elevator.

It is clear from the evidence that plaintiff failed to carry the burden imposed upon him here. He showed no defect in any of the safety appliances with which the elevator was equipped, or any breach of duty owed by the defendant to him. There is no evidence to support plaintiff's contention that defendant faultily or negligently inspected or repaired the elevator, which negligence caused plaintiff's injuries; nor did plaintiff show any breach of its contract with the Isaly Dairy Company by the defendant.

The only duty defendant owed plaintiff was to use reasonable care in the installation of, and in making the inspections and repairs to, the elevator, which duty the evidence shows it discharged.

There is undisputed evidence that when inspected there was no defect in the elevator.

Defendant's inspector, called as a witness by plaintiff, testified on direct examination:

"Q. As a result of your inspection, did you find anything that had to be fixed, Mr. Murphy, that you recall? A. Pertaintaining to the accident?

"Q. Pertaining to the elevator, the shaft. A. I found nothing."

Witness Murphy testified on cross-examination:

"Q. While you were there, did you look at this freight elevator and the interlocks and the doors there on the first floor landing? A. I did.

"Q. And did you inspect them while you were there? A. Yes, sir.

"Q. Did you find anything wrong? A. I found nothing wrong at the itme.

"Q. And while you were there, did you talk to Mr. Britton, the plant engineer, Isaly's plant engineer? A. I did. In fact, we both looked at the door.

"* * * *

"Q. While you were there, did you try to open the outer door, the metal door on the loading platform, first floor level? A. I did.

"Q. When the elevator was not there? A. I did, sir.

"Q. Did it open? A. It would not open.

"Mr. Schumann: It would not? The witness: It would not open.

"Q. And it did not open, is that right, when you tried? A. And it did not open.

"The Court: When you say it would not, it probably did not.

"Q. In your presence did Mr. Britton try to open it? A. He did.

"Q. Did it open when he tried it? A. No, sir.

"Q. In your presence was Mr. Britton able to force it open? A. Yes, sir.

"Q. And tell the jury how he was able to do that. A. Due to the location of this lock, the bar coming down, you have three-eighths to a half an inch of play. In other words, you can reach and pull that door about that far (indicating).

"Q. Indicating a distance of what, about an inch or half an inch?

"The Court: About an inch. What would you say, an inch?

"Mr. Morris: I have to put it in the record.

"The Court: It looks like an inch to me.

"A. I will put it in words, sir.

"Q. All right, sir. A. It has approximately three-eighths to a half inch play, and it is very possible by taking the door and manipulating this little play that is between the arm on the door and the lock, that with force you will spring the lock and the door will open.

"Q. Did Mr. Britton do that in your presence? A. He did in my presence. After I couldn't pull it open.

"* * *

"Q. After Mr. Britton showed you that by manipulation it could be done, after that did the door work properly and hold properly under normal pressures? A. Under normal pressure, that's correct.

"Q. Did the Isaly dairy continue to use the elevator that day? A. Yes.

"Q. There was nothing that could be done, I take it, about this forcing; the door continued to be used as it was? A. That's right. There was no knowledge of any—there was no knowledge of anyone correcting anything.

"The Court: I didn't hear the question. (The last question and answer were read by the reporter.)

"Q. There was nothing to correct; it held under normal pressure?

"Mr. Schumann: Oh, I object.

"The Court: Why? What is the objection? Are you aware that this is cross-examination?

"Mr. Schumann: I guess I am forgetting, Your Honor. I keep thinking that this—

"Mr. Morris: I object to these outbursts. The question has not been answered.

"The Court: Read the question. (The last question was read by the reporter.)

"The Court: Is that right or wrong? A. That is correct.

"Q. In other words, on your inspection that day after this accident, that door was working properly, as it is designed to work? A. At my time there, yes."

It is equally clear that there was no fault in the elevator safety equipment. Clearly, such equipment was misused and abused by Isaly employees.

Notwithstanding plaintiff's claim by brief that "there is positive evidence that the inspections made by the Otis company on this elevator were superficial and grossly inadequate," he and his counsel have failed to call our attention to such evidence, and we have been unable to find it.

On the contrary, there is positive evidence by experts of long experience, who alone are able to testify concerning inspections, that the inspections, of which complaint is made, were wholly adequate, were made by men possessing the required knowledge, degree of skill and experience, and were performed in a workmanlike manner in accordance with approved elevator engineering practice.

Finally, in our opinion, the plaintiff was guilty of negligence directly and proximately causing his own injury.

We have heard and read the arguments of counsel for the respective parties and have read the entire record and applied the applicable law thereto, and we find no error committed by the trial court to plaintiff's prejudice in any of the respects urged.

The judgment of the Court of Common Pleas is affirmed.

*Judgment affirmed.*

GRIFFITH, P. J., and NICHOLS, J., concur.